UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————X
                                                              :
GARY JOHNSON,                                                 :
                                                              :          **COMPLAINT**
                                        Plaintiff,            :
                                                              :          ___ CV ____
                       -against-                              :
                                                              :          (Jury Trial Demanded)
THE CITY OF NEW YORK; POLICE OFFICER                          :
ANDREW CARDAMONE; POLICE OFFICER DENNIS                       :
BROOKS; POLICE OFFICER LOUIS PIA; POLICE                      :
OFFICER RICHARD SICA; POLICE OFFICER PAUL                     :
HEIDER; POLICE OFFICER FRANK BOVINO;                          :
POLICE OFFICER MARYANN BUBELNIK; POLICE                       :
OFFICER WILLIAM NEVINS; DETECTIVE                             :
FALCIANO; and JOHN DOES 1-6,                                  :
                                                              :
                                        Defendants.           :
                                                              :
———————————————————————X

GARY JOHNSON, by his attorney THOMAS HOFFMAN, ESQ., complaining of the

defendants, respectfully alleges, upon personal knowledge and information and belief, as

follows:

**NATURE OF ACTION**

1.      This civil rights action under 42 U.S.C. §§ 1983 and 1988, and New York law,

arises from the wrongful arrest, prosecution, and conviction of Gary Johnson, one of three

innocent men whose lives were destroyed by police and prosecutors who railroaded them for a

high-profile Queens murder they did not commit, and caused each of them to lose 24 years of

their lives in prison.

2.      Johnson and his codefendants Rohan Bolt and George Bell were convicted of the December 21, 1996, murder of Charles Davis, an off-duty police officer, and Ira "Mike" Epstein in the failed holdup of Epstein's Astoria Boulevard check cashing store when it opened just after 7:00 a.m. on December 21, 1996.[1]

3.      Twenty-four years after Johnson and his codefendants were falsely convicted, the Queens District Attorney's Office admitted that the prosecutors handling the three men's cases had suppressed a mountain of exculpatory and impeaching material from their attorney's, and agreed to vacate the three men's conviction and to dismiss their indictments.  The withheld evidence consisted of a mountain of third-party culpability evidence exculpating Johnson and his codefendants and pointing to the murderous "Speedstick" gang as the true perpetrators of the crime, and evidence that a key witness in the case —Mark Bigweh— entered into a secret cooperation agreement with prosecutors, committed perjury, and suffered from hallucinations.

4.      The State court, in vacating the convictions and ordering the three men's immediate release from prison, castigated law enforcement and found that their handling of the case, which left "the distinct impression that the suppression of the information [exonerating him] was not an isolated instance of misconduct, but part of a larger pattern of behavior that was calculated to deprive the defendants of fair trials[.]" *People v. Johnson*, 71 Misc.3d 646, 665 (Sup. Ct.  Queens Co. 2021) (Zayas, J.). The court found that "[t]he extensive record before the Court . . . makes clear that . . . the District Attorney's Office . . . deliberately withheld from the

---

[1]Two other men, Mark Bigweh and Jason Ligon, were initially charged with the crime as well.  Bigweh ended up becoming a witness for the prosecution, and the State dropped the charges against Ligon after Bolt was convicted.

defense credible information of third-party guilt that was in its possession and that had in fact been investigated." *Id*

5.      Three months after Johnson's conviction was vacated, the Queens District Attorney's Office ("QDAO") announced it had conducted an "extensive and exhaustive investigation" of the murders at issue, and found no evidence linking Johnson to the crime. The QDAO then finally dismissed all charges against Johnson, and his two codefendants, George Bell and Rohan Bolt.   But by then, all three men had lost nearly a quarter of a century of their lives in prison for a crime they did not commit.

6.      This lawsuit seeks to hold those responsible for this catastrophic injustice accountable.   It also names several police officers and the City of New York as defendants, as the City's employees' misconduct, and the subsequent 24-year cover-up of it, was substantially caused by the City's policies and customs, deliberate indifference to the likelihood that constitutional violations would occur, and the City's failure to supervise and discipline police and prosecutors who committed such misconduct, even though such misconduct was rampant throughout the Police Department and QDAO at the time Johnson was arrested, prosecuted, and convicted.

**JURISDICTION, VENUE & CONDITIONS PRECEDENT**

7.      This action arises under 42 U.S.C. §§ 1983 and 1988, and under the common law of the State of New York.

8.      Jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331 and 1343, and by principles of pendent jurisdiction.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

10.     On or about June 3, 2021, Johnson filed with Defendant City of New York a timely Notice of Claim under General Municipal Law § 50-e.   Johnson's General Municipal Law§ 50-h hearing was held on October 12, 2021.

11.     More than 90 days have elapsed since Johnson's submission of his notice of claim and 50-h hearing.  Johnson has complied with all conditions precedent to commencement of this action.

## THE PARTIES

12.     Plaintiff Gary Johnson ("Johnson") is a citizen and resident of the State of  New York.

13.     Defendant, City of New York (the "City"), of which the County of Queens is a subdivision, is a municipal corporation of the State of New York and a resident of the Eastern District of New York.

14.     Defendant Andrew Cardamone at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment.  He is sued in his individual and official capacities.

15.     Defendant Dennis Brooks at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

16.     Defendant Louis Pia, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances,

regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

17.     Defendant Richard Sica, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

18.     Defendant Paul Heider, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

19.     Defendant Frank Bovino, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

20.     Defendant Maryann Bubelnik at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of her employment.  She is sued in his individual and official capacities.

21.     Defendant William Nevins at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

22.     Defendant Michael Falciano, at all times relevant to this complaint, was a duly appointed police officer of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within the scope of his employment. He is sued in his individual and official capacities.

23.     Defendants John Does 1-6 are presently unknown police officers at all times relevant to this complaint, were duly appointed police officers of the NYPD, acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and the CITY, and acted within their scope of his employment.  They are sued in their individual and official capacities.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.     The Crime: An Off-Duty Police Officer And A Check-Cashing Store Owner Are Murdered In Queens**

24.     In the early morning hours of December 21, 1996, Ira "Mike" Epstein, the owner of a local check cashing store on Astoria Boulevard in East Elmhurst, Queens, and NYPD Officer Charles A. Davis, who was working off-duty as Epstein's security guard, were shot and killed in the failed armed robbery of Epstein's store (the "Astoria Boulevard Murders" or the "Murders").

25.     A manhunt for the killers began immediately. The *New York Times* described an "intensive sweep throughout northwestern Queens" that ensued in an attempt to identify and arrest the perpetrators — with "thousands of cars" stopped, "thousands of summonses" issued, and "hundreds of suspects" questioned. Randy Kennedy, *3 Charged in Killings of Officer and Businessman in Queens*, N.Y. Times, Dec. 26, 1996.

6

26.     Then-Mayor Giuliani and top NYPD officials immediately declared that they "would not rest" until the crime was solved and began exerting intense pressure on the Police Department to solve this "Christmas Tragedy" before the holiday a few days away.

27.     The initial investigation of the crime immediately pointed to a murderous local gang (later revealed to be known as "Speedstick" that had committed multiple similar armed robberies around the neighborhood.

28.     The day after the murder, the *Daily News* reported that a "gang" had "ambushed" Epstein and Davis and that "[i]nvestigators believe the killers may be the same robbers who hit two other check-cashing businesses in Queens last week, the latest one on Friday [December 19, 1996] in Queens Village."

29.     Consistent with this belief that a local gang that had robbed two other check-cashing businesses in the neighborhood had also committed this crime, the NYPD covered the neighborhood with wanted posters stating that the suspects "were involved in a past robbery at a check cashing business in the 105 Pct. [in Queens]." These wanted posters described the suspects as three black men ranging from 5'11" and 6'3" in height and weighing 180, 185 and 190 pounds, respectively.

30.     Johnson did not fit any of these descriptions.

31.     The NYPD also put out an "all points bulletin" which pointed to this stickup gang as the lead suspects. The bulletin described three suspects in a robbery of another check cashing store nearby and stated that "two of the above individuals may be connected to the murder of the police officer on 12/21/96 in 115PCT.

**B.**   **Johnson Is Falsely Implicated by a Mentally Unstable Drug Dealer**

32.   On December 23, 1996, police arrested 20-year-old John Mark Bigweh for selling marijuana.

33.   Bigweh was on probation for robbery and assault charges and faced significant criminal and immigration consequences if he did not cooperate with the police.

34.   Police saw an opportunity and they used this leverage and their desperation to solve the murder before Christmas (as Mayor Giuliani had directed police brass to do) to somehow turn Bigweh from a low-level drug dealer to an accomplice to murder.

35.   Over the course of three unrecorded interrogations over two days, Bigweh told an evolving story that eventually ended with Bigweh confessing to participating in the crime and falsely claiming that George Bell was the shooter.

36.   Bigweh's evolving description of the crime made clear from the start that he was not a reliable witness.

37.   When Bigweh was first interrogated about the murder (after being arrested for marijuana possession), he stated that he was not a participant in the crime. He claimed he had been out partying with Bell and Gary Johnson on December 20th and 21st, and they later approached him on the street about going with them to commit a robbery, which Bigweh refused to do. Bigweh also named an unknown accomplice named "Zebedia" as a participant in the robbery.

38.   Bigweh was then driven around in a van for six hours with Detective Michael Falciano, known as "the Falcon."

39.     After six hours with the Falcon, Bigweh implicated himself in the crime. In his second statement, Bigweh admitted that he had participated in the crime along with Bell, Johnson, someone named "Roti," and a getaway driver named "Jason." Zebedia had now disappeared from the story. Bigweh also oddly claimed that the five men had driven to Bigweh's home so he could change from a green jacket to a navy blue one.

40.     To this day, there is no independent evidence (i.e. evidence other than Bigweh's own statement) tying Bigweh to this crime.

41.     Nonetheless, based on Bigweh's statement *alone*, police turned their attention away from a local robbery gang with an MO of sticking up check cashing stores, and towards Johnson and Bell.

**C.     Defendants Cardamone and Brooks Arrest Johnson And Coerce Him Into Adopting A Statement They Manufactured**

42.     Defendants obtained false "confessions" from Johnson and his codefendant Gary George Bell.

43.     Specifically, Defendants Cardamone and Brooks interviewed Johnson and did not record anything that occurred, or discarded their notes, during the twelve hours that they interrogated him.

44.     Johnson's confession was also facially unbelievable in numerous ways.

45.     Johnson stated that after an evening of hard partying the night before, he passed out, and that he "was still drunk" the next morning and "[didn't] know what time it was when I woke up."

46.     Johnson stated that he had driven to the check cashing store with someone named "Jason" and "two of Jason's friends that I didn't know." He added that he didn't really know Jason either.

47.     Johnson also claimed (contrary to Bigweh and Bell) that Bell was already at the check cashing store when they arrived and the he and Bell did not speak that morning. In other words, Johnson claimed that he committed this crime with three people he did not know and Bell—who he hadn't spoken to prior to arriving. When pressed on this striking claim, Johnson stated that he did not even remember the crime but had "seen it on the news" but he "didn't think [he] was involved in it because [he ] woke up and it was just another day for [him]."

48.     Johnson also could not decide if he had spoken to Bell after the Murders, first claiming that when he "woke up in the morning [he] called [Bell]. We were talking and I was asking him what are you gonna do today. He said he was sick or something." Johnson then changed his mind and said he had only spoken to Bell's sister and he "never really got a chance to talk to Bell" in the four days since they had apparently committed a double homicide together.

49.     Johnson screamed as he was being interrogated. Johnson's confession was also obtained through police coercion.

50.     Defendants Cardamone and Brooks knew this unbelievable confession was false.

51.     Defendants Cardamone and Brooks provided this false confession, implicating Johnson to prosecutors.

52.     Upon information and belief, Defendants Cardamone and Brooks never informed prosecutors that Johnson's confession implicating Bell was false.

53.     Upon information and belief, Defendants Cardamone and Brooks never informed prosecutors that this confession was obtained through coercion.

**D.     Police Bolster The Case Against Johnson By Coercing False Confessions From Johnson's Two Codefendants Implicating Him In The Crime**

54.     In addition to coercing Johnson's confession, police secretly manufactured and coerced the confessions of two of Johnson's codefendants, and hid this from prosecutors and Johnson's trial attorney.

55.     The first codefendant was a man name Jason Ligon.  Bigweh had identified someone named "Jason" as the getaway driver, a detail that Bell and Johnson both repeated (having been fed the statement by the police).

56.     On May 30, 1997, the police arrested a man named Jason Ligon. After five hours in police custody, Defendants Bubelnik and Bovino secured Ligon's confession to his purported involvement in the Murders.

57.     Defendants Bubelnik and Bovino worked in close collaboration with Detectives Sica and Pia, and fed the same facts to Jason Ligon that Pia and Sica fed to Bell.

Defendants Bubelnik and Bovino were intimately familiar with both the true facts and coerced falsehoods about the Astoria Boulevard Murders. Defendant Bubelnik was one of the officers present at Bigweh's confession.

58.     Defendants' Bubelnik and Bovino orchestrated and supervised Bell's and Bolt's lineups on December 26, 1996, and the fingerprinting of Bell, Johnson, Bolt, and Bigweh.

They had all of the knowledge of the case to ensure that Ligon's confession would line up with Bell's.

59.     Like Bell, Ligon confessed that he (Ligon) was the driver, that Bell was the shooter, and that Bolt (his name now having evolved from "Roti" to "Rohan") put the robbery plan together.

60.     In fact, Ligon went into even more extensive detail than Bell about the plan for the robbery, what was discussed among the men committing the crime, and how the plan was executed.

61.     Though Ligon's video and written confession mirrored Bell's (except it wasmore detailed), Ligon was not even in New York at the time of the Murders.

62.     Ligon's counsel hired a private investigator who determined that Mr. Ligon was in Washington, D.C. at the time of the Murders.  *See Johnson*, 71 Misc. 3d at 650.  Ligon's private investigator provided this alibi to District Attorney InvestigatorsTeddy Wess and Stanley Carpenter, who confirmed its accuracy on their own trip to D.C. Wess and Carpenter determined that the evidence established that Ligon was not involved in the Astoria Boulevard Murders.

63.     Ligon had no motive to falsely implicate himself in  a crime he did not commit, and Ligon's (false) confession was obtained through police coercion.

64.     Ligon has since told investigators that police officers provided him with alcohol during the interrogation.  Wess and Carpenter stated to Ligon's private investigator that, notwithstanding Ligon's innocence, the charges against him would not be dismissed until Johnson, Bell, and Bolt were tried.

65.     Wess and Carpenter further told Ligon's private investigator that they were aware that Ligon was facing felony drug charges in a separate case, and that the time he spent incarcerated as a result of his arrest in connection with the Astoria Boulevard Murders (crimes

the QDAO knew he did not commit) would be credited against the time he would ultimately serve on the drug charges.

66.     In other words, the QDAO contemporaneously acknowledged that (1) they knew Ligon was innocent and had given a false confession; but (2) would nonetheless not dismiss the case against Ligon until after Bell, Bolt, and Johnson were tried.

67.     Wess and Carpenter, in conjunction with Defendants Bubelnik and Bovino, did not want to admit that Ligon was innocent and the policehad coerced a false confession.

68.     And this is exactly what happened. Even though Defendants Bubelnik and Bovino and the DA investigators knew of Ligon's' alibi months before Bell's trial, charges against Ligon were not dropped until Bell, Johnson, and Bolt had all been convicted.

69.     Bell's counsel was never informed by the QDAO that Ligon's confession was false.

70.     Defendants Bubelnik and Bovino knew Ligon's confession implicating Bell was false, but nonetheless provided it to prosecutors.

71.     Johnson's defense counsel was never informed that Ligon was innocent, that his confession was false, or that police officers coerced his confession.

72.     This proof of Mr. Ligon's innocence was *Brady* material that was not produced to Johnson's counsel.

73.     On information and belief Defendants Bubelnik and Bovino never informed prosecutors that Ligon's confession was obtained through coercion. Alternately, if prosecutors knew that Ligon's confession was obtained through coercion, they wrongfully withheld this *Brady* material from Bell's, as well as Johnson's defense team.

74.     Moreover, as the QDAO acknowledged in June 2021, "Det. Bubelnik also had a pending lawsuit against her at the time of trial which stemmed from a previous case in which she was accused of coercing a false confession from the defendant in that case."

75.     Defendant Bovino was also a defendant in that "pending lawsuit," and was also accused of participating in extracting a false confession.

76.     That lawsuit was ultimately settled.

77.     That Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant was *Brady* material.

78.     Prosecutors never disclosed to Johnson's defense team that Defendants Bubelnik and Bovino were accused of coercing false confession from a criminal defendant.[2]

79.     On information and belief, Defendants Bubelnik and Bovino did not inform the QDAO about this prior lawsuit.  Alternately, if prosecutors knew about this prior lawsuit, they wrongfully withheld this information from Johnson's defense team.

80.     Because these Defendants concealed Ligon's coerced confession, the jury never learned that the police had extracted a false confession from another co-defendant that was very similar to Bell's and Johnson's false confessions.

81.     Because these Defendants concealed Ligon's false confession, the jury never learned that both Johnson's and Bell's "admissions" in their coerced confessions that "Jason" was the driver was indisputably false.

---

[2]*See e.g. Kyles v. Whitley*, 514 U.S. 419, 446 (1995) (evidence undermining the State's investigation is favorable material for Brady purposes).

82.     The second codefendant who police coerced and manufactured a statement for was Bell.  *See* Complaint in *Bell v. City of New York*, 22 CV 3251 (DG)(PK) (E.D.N.Y.), Doc # ¶¶ 64-139, which we incorporate here, and in all following paragraphs.

83.     Detectives working with Cardamone and Brooks beat Bell, threatened him.  *Id.*

**E.     A Media Frenzy Follows Johnson's Arrest**

84.     Johnson was convicted in the press before he ever entered a courtroom.

85.     Mayor Giuliani appeared at a press conference on Christmas Day with high-level police brass to praise the detectives who led the investigation for cracking the case.

86.     Mayor Giuliani kissed Detective Falciano at the press conference as he thanked him for cracking the case by eliciting Bigweh's confession.

87.     The *Daily News* ran a front-page story with a picture of Johnson's codefendant Bell in tears and labeled him the "CRYBABY COP KILLER"—crybaby because he was brought to tears by the terror of being falsely accused of a double murder.  Another article, "Rap sheets of 4 held in slays," prominently displayed a picture of Johnson upon his arrest for the murders.

88.     The *Daily News* would later run a full-page editorial advocating that Johnson's codefendant, Bell, be put to death.

89.     The police orchestrated a "perp walk" of Bell and the *New York Post* ran a front-page story with a picture zoomed in all the way on Bell's face during the perp walk with the headline "THE FACE OF EVIL."  The article stated that Johnson committed the murders along with Bell.

**F.      Johnson's Trial: The Prosecutor Suppresses *Brady* Material**
**        And Uses False Or Misleading Evidence And Argument**

90.      Johnson was incarcerated on Rikers Island, an ultra-violent pretrial detention jail, for almost three years while awaiting trial on the murder charges.

91.      Johnson was finally tried in the fall from November 22 to December 6, 1999.

92.      ADA Brad Leventhal —who along with ADA Charles Testagrosa had previously tried codefendant George Bell's case— tried  Johnson's case.

93.      The principal items of evidence against Johnson was his coerced and fabricated confession, and the testimony of John Mark Bigweh.

94.      ADA Leventhal, elicited perjury from Bigweh.  On direct examination, ADA Leventhal asked Bigweh, "Have you entered into an agreement cooperation agreement with the Queen's District Attorney's Office," to which Bigweh responded "Yes."  Bigweh was then cross-examined on the point by Johnson's lawyer, who asked Bigweh:  "[Y]ou signed a cooperation agreement with the District Attorney's Office in this case," to which Bigweh again answered "Yes."

95.      On re-direct, ADA Leventhal asked Bigweh:  "Do you remember the date that you entered into the cooperation agreement with the Queens County District Attorney office?" Bigweh answered, "Yes, 10/28/99."  ADA Leventhal then showed Bigweh and had him identify "the cooperation agreement" he entered into that day.

96.      Unbeknownst to Johnson, his attorney, or the court and jury, just over a month after Johnson's arrest, Bigweh had actually entered into a secret written cooperation agreement with the QDAO on January 30, 1997 (the "secret cooperation agreement"), prior to entering into

the October 28, 1999, cooperation agreement revealed at trial.  That secret cooperation agreement was far more beneficial to Bigweh and gave him an even greater incentive to fabricate evidence against Johnson.

97.     The secret cooperation agreement provided that in exchange for Bigweh's cooperation, "the Office will make a recommendation on the disposition of the pending cases that depends on the nature and extent of the cooperation."  This agreement — which created a direct incentive for Bigweh to help the Queens DA obtain a conviction — was not disclosed to Johnson or his codefendants' lawyers.  (The secret cooperation agreement would not be revealed until 24 years later, when the CRU reinvestigated Johnson's case.)

98.     Also undisclosed was the fact that Bigweh entered into the secret cooperation agreement only after Bigweh attempted suicide attempt, was found by prison staff to have suffered from hallucinations.

99.     Further, ADA Leventhal suppressed from Johnson and his attorney that Bigweh's secret cooperation agreement was repudiated by ADA Testagrossa when Bigweh refused to cooperate on the eve of Bell's trial.

100.     All of this impeached Bigweh's false testimony against Johnson that he cooperated in the case merely  "[b]ecause [he] felt that it was wrong," not because he expected leniency.

101.     Johnson offered alibi testimony from Bell's sister, Denise, and his mother, Esther, who testified that on the morning of the Astoria Boulevard check cashing murders — from

around 6 a.m. until well after 8 a.m. — Johnson was in the Bell family's living room visiting

Bell's sister, Denise, who was Johnson's girlfriend at the time.[3]

102.    During summation, ADA Levanthal argued to the jury that Johnson's fabricated

statement proved his guilt, and that Bigweh was a credible witness.

103.    ADA Leventhal argued the deal Bigweh had received was a 5 to 10 year sentence,

omitting any mention of the secret cooperation agreement that could have resulted in all of

Bigweh's charges being dismissed.

104.    ADA Leventhal falsely argued the cooperation agreement he introduced at trial

was the full universe of benefits Bigweh received in exchange for his cooperation:

> "So I will not apologize for the deal that has been given to John
> Bigweh for his cooperation. He's earned it.  And as long as he
> continues to abide by the terms of his agreement, we'll continue to
> abide by ours.  And by the way, the terms of that agreement are
> fully set forth in the cooperation agreement which is in evidence."

105.    Because Detectives Cardamone and Brooks concealed that they coerced

Johnson's confession, neither the prosecutors nor the jury ever learned of its falsity.  Likewise,

because police concealed that they coerced false confessions from Johnson's codefendants, Bell

and Ligon, Johnson was deprived of the use of that evidence to attack his own "confession."

106.    Nor did the ADA Leventhal disclose a mountain of *Brady* material implicating the

Speedstick gang as the real perpetrators.  *See* ¶¶ 109-149, below.

---

[3] ADA Leventhal also presented the jailhouse snitch testimony of Reginald Gousse, who claimed
Johnson and Bell confessed to him on Rikers Island.  But under Rikers Island protocol, Johnson
and Bell would never have been permitted to mingle in any recreation yard.  And because
Johnson, Bell, and Gousse were housed in separate units, they never would have been in the
same recreation yard at the same time.

107.    Johnson was convicted of two counts of depraved indifference murder, one count of felony murder, and related charges.  On February 22, 2000, he was sentenced to 50 years to life in prison.

108.    The QDAO then successfully opposed Johnson's direct appeal by relying on the false evidence and trial narrative ADA Leventhal used during Johnson's trial.

**G.    Twenty-Four Years After Johnson Is Falsely Convicted, A New District Attorney's Conviction Integrity Unit Reinvestigates His Case And Reveals A Mountain Of *Brady* Material Suppressed By Police And Prosecutors**

109.    In the years following Johnson's conviction, significant *Brady* material has emerged that was never turned over to the defense.

110.    The most significant of these revelations is DD5 288. This DD5 documents that by May 1997 at the latest, police were aware that a member of the Speedstick gang had confessed to the Astoria Boulevard Murders for which George was convicted.

111.    DD5 288, dated May 16, 1997, and prepared by Defendant Heider (one of the very witnesses Bell had attempted to call at trial to explore the connection between the May 1997 robbery and the murder with which he was charged), memorializes an interview of "Witness #1" who provides a detailed account of the activities "of a Robbery Ring that was run by the Twins Aaron and Ammon Boone."

112.    By way of background, DD5 288 provides a detailed description of the robbery gang's operations and provides summaries of at least *seven* armed robberies carried out by the group in 1996 and 1997.

113.     Witness #1 identified Jamal Clark as a member of the robbery gang and stated that he had personally participated in several of the robberies with Clark and one or both of the Boone Twins.

114.     Several of these robberies carried out by Speedstick involved victims being shot, stabbed, or sliced.

115.     DD5 288 then goes on to directly implicate this robbery gang in the murder for which George Bell was convicted. The DD5 provides:

> *[Witness #1] stated that he was told by Jamal Clark that the group robbed a check cashing store on Astoria Blvd. This job was set up by the [Boone] Twins and that Jamal Clark was outside and that something went bad. They did not get any money.* Witness #1 stated that this was a phone call and that Jamal Clark was down south at the club with the Twins after this robbery. Jamal told him that he was upset because he was doing a lot of jobs also in NY and down south and that he was not getting a fair share of the money. He was concerned that if he left that the Twins may kill him because they felt that he knew to[o] much and could tell the police. Jamal told him he was leaving and he did.
>
> Witness #1 stated that Jamal Clark had a code name for all the robberies that he participated in with the group. The name is JASON.
>
> (emphasis added).

116.     DD5 288 also reports that Clark's fear of being murdered was well-founded.

117.     Witness #1 stated that another gang member, Kevin McKinney, told him that Aaron Boone later shot Clark in the back of the head.

118.     Subsequent events make clear that the QDAO viewed Witness #1 to be a credible witness.

119.     In January 1999, months before Johnson's trial, the QDAO indicted Aaron Boone for Clark's murder—consistent with the information supplied by Witness #1 in DD5 288.

120.    Additional wrongfully withheld DD5s further corroborate DD5 288.

121.    In DD5 291, Witness #1 provides additional details regarding members of the Speedstick robbery gang, including their nicknames, addresses, appearance, and more—further bolstering his credibility and specifically identifying the likely murderers.

122.    In DD5 548, another member of the robbery ring identified as "Witness #2" told detectives in an interview that took place *at the Queens DA's Office* that Jamal Clark had told him "I'[]m tired of this shit." When Witness #2 asked Clark what he was tired of, Clark responded "that shit in Corona"—an apparent reference to the Astoria Boulevard Murders for which Johnson was convicted.

123.    It is clear that Jamal Clark and the Boone twins—not Johnson—murdered Epstein and Davis and that police and QDAO knew it in 1997, but chose to withhold this information from George's defense team despite multiple specific requests.

124.    As Justice Zayas unequivocally found: "Under no circumstances could the prosecutors in these cases have reasonably believed that this information—which suggested that another group of perpetrators, with a history of armed robberies targeting large amounts of cash, was responsible for the Murders of Epstein and Davis and thus contradicted the People's theory of the case— was not favorable to Bell, Bolt, and Johnson and did not have to be disclosed." *Bell*, 71 Misc. 3d at 662.

125.    Trial counsel for Robert Majors (one of the alleged Speedstick members charged with another neighborhood robbery along with Aaron Boone) was only provided with a redacted, two-page copy of DD5 288 and a redacted copy of DD5 291 in the year 2000, when Johnson was sentenced.

21

126.    The copies that Majors's counsel received had all of the information that would have exonerated Johnson either redacted or, in the case of DD5 288, with the third page containing information exculpating Johnson missing in its entirety.

127.    In other words, the QDAO was well aware of Speedstick's involvement in Astoria Boulevard Murders by 1997 (per ADA Testagrossa's notes) and was in possession of these specific DD5s by at least 2000, and chose to suppress this clear evidence that Johnson was innocent.[4]

128.    The information withheld from Johnson's defense team was far from limited to these DD5s. Following the revelations of DD5 288, Johnson's post-conviction attorneys at Wachtell Lipton Rosen & Katz approached the QDAO's newly-formed Conviction Integrity Unit ("CIU").

129.    CIU did a thorough re-investigation of Johnson's conviction, which identified other exculpatory information that was in the possession of law enforcement, but had never been disclosed to Johnson

130.    All of this newly-discovered information either points to Speedstick gang as the culprits or evidences that Johnson's confession was unreliable.

131.    The below documents were never produced to Johnson before the CIU reinvestigation:

        a.    DD5 548 (discussed above).

---

[4]It is worth noting DD5 288 was uncovered only through the most fortuitous of circumstances. Robert Majors has maintained his innocence and, in connection with his challenges to his convictions, these DD5s were produced to his lawyer, the undersigned. Majors's lawyer happened to have been familiar with Johnson's case, recognized the significance of these productions, and contacted Johnson's counsel. But for that event, Johnson and his codefendants would still be serving a life sentence for a crime they did not commit.  Majors's conviction was vacated in 2020 after a state court found that the QDAO withheld *Brady* material in his case.

b.      The NYPD "all points bulletin" from before Johnson's arrest which stated that the robbery ring were the lead suspects in the Murders.

c.      Additional police reports reflecting similar modus operandi between the suspects in the Astoria Boulevard Murders and other recent robberies in Queens, including (1) the time of day the crime occurred; (2) the number of perpetrators; and (3) the manner in which the perpetrators forced entry into the business.

d.      A DD5 reflecting that just days before the murder, three or four men appeared to be casing Epstein's check cashing store and that one of them had a scar on the left side of his face near his lip in a horseshoe shape and a thin mustache. A photo of Jamal Clark from the time of the Murders reveals a scar and mustache matching this description.

e.      A DD5, authored by Defendant Brooks, memorializing an interview with Jamal Clark's girlfriend at the time of the Astoria Boulevard Murders that further corroborates Witness #1's claim that Clark was closely associated with the Boone twins and that he went to the Boones' club in South Carolina with them shortly after the murder. Upon information and belief, Defendant Brooks did not provide this information to the QDAO or, in the alternative, this information was not provided by prosecutors to the defense.

f.      Additional evidence corroborating that Boone murdered Jamal Clark, adding more credence to the statements of Witness # 1 regarding Clark and Boone's involvement in the Murders for which Johnson was convicted.

g.      A DD5 memorializing the interview with a victim of the May 9, 1997 robbery of a Flushing, Queens business stating that "Green Van which was occupied by a M/B wearing a Green Army Jacket and sitting in drivers side of Van." This description matches the description from a witness to the Murders who testified at Johnson's trial that the shooter was wearing a "green army jacket."

h.      A DD5 reflecting that Bigweh told Witness #2 that he actually was not involved in the robbery and Murders (when his supposed involvement was the only thing leading the police to Johnson in the first place).

23

i.     Records reflecting that Bigweh had attempted suicide in custody and then needed mental health evaluations.[5] The QDAO had "obtained medical records related to the suicide attempt, which included information that Bigweh had a history of experiencing 'AH [auditory hallucinations]' of his dead mother at stressful times like his birthday or hers or the anniversary of her death. The voice tells him to 'go home.'" *Johnson*, 71 Misc.3d at 650.  "None of these records, which were in the District Attorney's file related to this case, were disclosed to the attorneys representing Bell, Bolt, and Johnson, despite specific requests for information of this sort having been made." *Id.* These records included handwritten notes with the name "Greg Lasak"—the lead prosecutor in Johnson's case up until trial and a member of the QDAO capital case committee—at the top of the page recording that Bigweh had been sent for a psychiatric evaluation.

j.     Bigweh's cooperation agreement that was terminated shortly before Mr. Bell's trial, even though Johnson's defense team had specifically requested any such cooperation agreements.

k.     A DD5 describing an interview with witness Altagralia Durna, who described the getaway car as a light blue Aerostar van with white stripes and who identified the stolen blue Ford Aerostar van recovered near the crime scene as the likely getaway vehicle. Incredibly, the QDAO did not disclose to Johnson's defense team that this witness existed until two-and-a-half months after his trial began and the day after the witness had left the country, and even when disclosing her still did not disclose the DD5 reflecting the interview in which she identified the blue van recovered by the police as the getaway vehicle. Bell stated that the van was burgundy in  his false confession.

l.     During the same undisclosed interview, Ms. Duran also described the assailant as "light skinned male black or Hispanic." Neither Bell, Johnson, or Bolt meet that description;.

m.     Interviews with an additional five eyewitnesses identifying the color of the van as either blue or green. Two of the witnesses also identified the van as having either North Carolina or South Carolina plates—further tying the crime to the Boone twins, who owned a night club in South Carolina.

n.     The DD5 from an interview with a man named Dennis Knight days before Johnson was arrested in which Knight stated that he had "no specific information" of the crime but had a hunch that someone that he knew named Devon might have been involved in the Murders and that Devon "usually drives a red or burgundy Plymouth Voyager van (*i.e.*, the source

of the "burgundy" van information—corroborated by none of the eight eyewitnesses who gave statements to the police—fed to Bell by the police).

132.    The CIU investigation also uncovered a DD5 63, dated March 28, 1997, reflecting that just three weeks after Jamal Clark's murder, Queens Homicide Detectives supplied information regarding Clark's murder to Defendants Pia and Sica.  This coordination between the detectives investigating Clark's murder and Defendants Pia and Sica—who were investigating the murder with which Johnson was charged—further demonstrate that these cases were always related and the investigating detectives were well-aware of the alternative suspects.

133.    The information in this DD5 and its clear implication that the police knew about the relationship between Speedstick and the murder for which Johnson was convicted was also confirmed during CIU's reinvestigation.

134.    One of the lead detectives in the Speedstick investigation, Detective Stacey Calantjis, confirmed he and the other Speedstick investigators shared everything they uncovered about Speedstick with Defendants Pia and Sica.

135.    Calantjis also confirmed that he provided all of the information he had to Defendant Pia and Sica's boss, Defendant Nevins, but that Nevins did not pursue any of the leads regarding Speedstick's involvement.

136.    Defendants Nevins, Pia, and Sica did not provide this information to the QDAO or, in the alternative, prosecutors wrongfully withheld this information from Johnson's defense team.

137.    The CIU reinvestigation also revealed that Defendant Bubelnik fabricated evidence against codefendant Bell.

138.    In May 1997, Detective Bubelnik drafted a DD5 575 regarding an interview with Rodney Boone (no relation to the Boone twins). Detective Bubelnik stated that Mr. Boone (1) informed her that she "had the right people"; (2) told her that the "word on the street" was that Rohan Bolt supplied the guns and got them in Brooklyn; and (3) identified Jason Ligon as a participant in the crime.

139.    Rodney Boone was interviewed as part of the CIU investigation and vigorously denied making any of these statements. Mr. Boone told investigators that he never told the police they had the right people, never told police anything about Bolt who Boone only knew of because he owned a local restaurant, and never identified Ligon, who he had no basis to believe had any involvement in the crime.

140.    Instead, Rodney Boone told investigators that *Defendant Bubelnik* said to him "we have the right people," a statement which Mr. Boone did not confirm or deny since he had no knowledge of who committed in the crime.

141.    Defendant Bubelnik fabricated this DD5 claiming that Mr. Boone told her that they "have the right people."

142.    In addition to the voluminous documents discussed above reflecting Johnson's innocence, the CIU also produced the handwritten notes of ADA Charles Testagrossa.

143.    These notes taken *before* Johnson's trial in a folder labeled "Speedstick" reveal that as early as 1997 Testagrossa "[b]elieve[d] Jamal was driver in Davis homicide"; "Jason was Jamal"; and knew of "Speed Stick Bosses: Twin Boones. Bernard Johnson. Jamal Clark 'Jason.'"

144.     As Justice Zayas put it, "[i]t is . . . mindboggling that Testagrossa asserted in open court that there was no link between the Boone-led Speedstick gang and this case." *Bell*, 71 Misc. 3d at 662.

145.     Even if Testagrossa had forgotten about his conversations with Defendant Heider by the time Johnson went to trial in 1999, they were readily available to him throughout the trial. Rather than consult his own notes of the relationship between the cases when Johnson's defense team sought to call Heider to testify, Testagrossa, in consultation with Defendant Heider, made blanket assertions that there was no connection between the cases and impugned the defendants' counsel for implying otherwise.

146.     Moreover, additional documents only recently disclosed reflect that police were investigating Clark as early as March 1997, when Defendants Bovino and Bubelnik did a "complete workup" of Jamal Clark and obtained numerous photographs of Clark. Defendant Sica then placed a picture of Clark in a photo array with pictures of  Bell, Bolt, Johnson, and Bigweh to at least one witness.

147.     Even though Defendants Pia, Sica, Bubelnik, and Bovino had had been actively investigating Jamal Clark, upon information and belief, once law enforcement learned Jason Ligon was in Washington, D.C. at the time of the murder, the NYPD made no further attempt to locate "Jason"—the supposed fifth participant in the murder of an off-duty police officer— because they knew that the real "Jason," *i.e.*, Jamal Clark, was deceased. This underscores that the police knew that the person they had previously identified as "Jason" was Jamal Clark, who was deceased.

148.     In other words, Defendants Pia, Sica, Bubelnik, and Bovino, in addition to
Defendant Heider, not only knew and withheld that Jason Ligon was innocent, but also withheld
from Johnson their apparent knowledge that they had identified Jamal Clark, a deceased
memberof the Speedstick gang, as a participant in the murder. Clark's inclusion would have
unquestionably warranted further investigation into Speedstick's involvement in the crime.

149.     These facts create the inescapable inference that Defendants Pia, Sica, Bubelnik,
Bovino, and Heider stopped their own investigation into Clark once he was deceased in order to
avoid implicating Speedstick and establishing that Messrs. Bell, Bolt, and Johnson were
innocent.

**H.     The State Court Vacates Johnson's Conviction, Dismisses His Indictment, And
         Excoriates The QDAO For The Prosecutorial Misconduct That Caused His
         Wrongful Conviction**

150.     Armed with this trove of newly discovered evidence, the QDAO, through its
Conviction Integrity Unit, together with Johnson and his co-defendants jointly moved to vacate
the convictions in March 2021.

151.     Justice Zayas granted the motion on March 5, 2021 (amended March 8, 2021) and
excoriated the law enforcement officials involved in the process.

152.     Justice Zayas found that the QDAO's handling of the case "leaves the distinct
impression that the suppression of the Speedstick information was not an isolated instance of
misconduct, but part *of a larger pattern ofbehavior* that was calculated to deprive the defendants
of fair trials." *Johnson*, 71 Misc. 3d at 664-65 (emphasis added).

153.     Justice Zayas elaborated that law enforcement's conduct in this case was
particularly "egregious given that the death penalty was being sought against 19-year-old

GeorgeBell." and the QDAO  nonetheless "completely abdicated its truth-seeking role." *Johnson*, 71 Misc.3d at 659.

154.    In addition to his finding of clear prosecutorial misconduct, Justice Zayas noted that the QDAO *conceded* that the circumstances surrounding Johnson's confession "raise legitimate concerns about [its] reliability" *Id.* at 663.

155.    On June 4, 2021, Johnson's indictment was dismissed with prejudice upon motion by the QDAO on newly discovered evidence grounds and all charges were dropped.

156.    In announcing the decision to seek to dismiss the indictment, the QDAO explained that between March and June of 2021, it had "conducted an extensive and exhaustive investigation" in which it: (1) reviewed all relevant documentary evidence, including both documents related to Johnson's case and the files of numerous other NYPD investigations of the alternate suspects in this case; (2) interviewed over 60 fact witnesses; (3) reviewed "hundreds and hundreds" of hours electronic evidence; and (4) reviewed "hundreds of hours" of forensic testing involving DNA evidence, ballistics evidence and the re-testing of fingerprint evidence.

157.    This thorough investigation did not turn up a shred of evidence implicating Johnson.

I.      **Johnson's Damages And Injuries**

158.    Johnson's injuries and damages include, but are not limited to:

(a)     His false and malicious arrest, prosecution and conviction for murder and robbery, and sentence to life in prison;

(b)     The wrongful denial or delay of his challenges to his conviction filed in State and Federal Court;

(c) His 24-year loss of his liberty, and the additional time he spent in jeopardy of being subjected to a retrial;

(d) Injuries he suffered witnessing assaults by other inmates, including the mental and emotional effects of such assaults;

(e) Past and future physical illnesses and injuries as a result of his wrongful conviction and experiences in prison;

(f) Past and future mental and emotional injuries and suffering;

(g) Lost employment income;

(h) The loss of the services, society, companionship, and consortium of his wife and fiancée, mother, brothers and sister, and other family members and friends;

(i) Legal fees and expenses for which he is responsible exceeding $450,000 based upon attorney time necessitated by exhaustive investigation and litigation required to uncover the QDAO's misconduct.

### FIRST CAUSE OF ACTION

(Malicious Prosecution and Deprivation of Liberty Under the Fourth,
Fifth, Sixth, and Fourteenth Amendments; 42 U.S. C. § 1983; All Defendants)

159. Johnson realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

160. Defendants Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, individually, collectively (the "Individual Defendants"), acting in concert and aiding abetting one another, intentionally, knowingly and willfully manufactured, or caused the manufacturing of, false statements and identifications by Bigweh, Johnson, Bell, and Ligon, which they improperly compelled or induced those individuals to adopt, accusing Bolt of the double murders and attempted robbery, and causing the QDAO to commence or continue criminal charges against Johnson.

161.    The Individual Defendants knew that the statements and identifications would be relied on by the QDA and the court as a basis to authorize Johnson's arrest, actually arrest him, and to formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at Johnson's trial.   Those statements and identifications were forwarded to the QDAO, which in turn did in fact introduce them during Johnson's pretrial hearings and trial.

162.    By virtue of the foregoing, the individual defendants, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against Johnson that they knew, or should have known, there was no probable cause for, and for which in fact there was no probable cause, and thereby caused Johnson to be deprived of his liberty.

163.    Those proceedings were ultimately terminated in Johnson's favor, in a manner affirmatively indicating his innocence.

164.    As a direct and proximate result of these acts and omissions, Johnson suffered the damages set forth in ¶ 158, above.

## SECOND CAUSE OF ACTION
(Evidence Manufacturing; Denial of A Fair Trial Under The Fifth, Sixth,
and Fourteenth Amendments; 42 U.S. C. § 1983;  All Defendants)

164a.   Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

165.    Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-4, acting individually and in concert, fabricated evidence  and concealed material exculpatory and impeachment evidence thereby depriving Johnson of his Fifth, Sixth, and Fourteenth Amendment rights.

31

166.    Detectives Cardamone and Brooks fabricated a DD5 claiming Johnson confessed to the crime, caused Johnson to create a false videotape statement claiming the same, and along with the other Individual Defendants and other unarmed coconspirators, created a host of other false police report as detailed above and in Bell's 42 U.S.C. § 1983 complaint, regarding Johnson's involvement in and commission of the crime, including Bell's statement, Jason Ligon's statement, and Mark Bigweh's statement.

167.    The Individual Defendants, including Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, did not intervene when Cardamone and Brooks created this false evidence.

168.    Cardamone and Brooks, and the Individual Defendants, falsely represented to prosecutors, in the course of charging and indicting Johnson, and at trial, that all of that false evidence was accurate, and all of the evidence factored into the QDAO's decision to charge Johnson with the crime.

169.    Johnson and Bigweh's statements were introduced against Johnson at trial and was a basis for the jury's verdict against him.

170.    Cardamone and Brooks, along with the other Individual Defendants, deliberately and recklessly coerced and/or fabricated, and created the above evidence.   These fabricated evidence was all provided to the QDAO, convinced them of Johnson's guilt, and would have been likely to influence a jury's decision were the evidence to be presented a trial.

171.    Upon information and belief, the Individual Defendants affirmatively misled ADAs Testagrossa and Leventhal at trial by representing that the Speedstick investigation had no relation to the Astoria Boulevard Murders.

172.    Upon information and belief, the Individual Defendants knowingly and deliberately chose not to document or disclose to the prosecutors information that was favorable and material to Johnson' defense. The suppressed evidence included but is not limited to:

    a.    That Defendants Pia, Sica, Heider, Bubelnik and Bovino were investigating Speedstick in connection with the Astoria Boulevard Murders, including investigating Jamal Clark;

    b.    That Jason Ligon's confession was coerced;

    c.    That Johnson's confession was coerced;

    d.    That George Bell's confession was coerced

    e.    That Defendants Bubelnik and Bovino had been sued on allegations that they had previously coerced a false confession; and

    f.    That Defendant Bubelnik falsified a DD5 claiming that a third-party had told her she "had the right people" (Defendants Bubelnik and Bovino only).

173.    Moreover, Defendants Pia, Sica, Heider, Bubelnik, and Bovino worked in concert deliberately to stop developing evidence that Jamal Clark was "Jason" and had participated in the Astoria Boulevard Murders in order to hide Speedstick's involvement and preserve the prosecution of Johnson.

174.    If these fabrications and exculpatory and material impeachment evidence were known to Johnson's defense team and had been documented and/or disclosed, such evidence would have tended to prove that Speedstick, not Johnson, committed the Astoria Boulevard Murders and that Johnson's confession was false, and cast doubt on the entire police investigation and prosecution.

175. The aforesaid conduct, which Defendants committed, operated to deprive Johnson of his rights under the Constitution and the laws of the United States to timely disclosure of all material evidence favorable to the defense pursuant to the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

176. As a direct and proximate result of these acts and omissions, Johnson suffered the damages set forth in ¶ 158, above.

### THIRD CAUSE OF ACTION
(Suppression of *Brady v. Maryland*, 373 U.S. 83 (1963) and Denial Of A
Fair Trial Under The Fifth, Sixth, Fourteenth Amendments; All Defendants)

177. Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

178. Defendants Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, individually, collectively, acting in concert, aiding and abetting, and conspiring with each other, intentionally, recklessly, and with deliberate indifference to Johnson's constitutional rights, suppressed from the QDAO and Johnson (a) the exculpatory and impeaching information detailed in above, (b) their creation of false police reports, (c) their false representations to the QDAO to convince that office to criminally charge Johnson, and (d) their own and each other's misconduct.

179. As a result of those defendants' suppression, prosecutors were unable to disclose to Johnson and his attorney the exculpatory information detailed in the preceding paragraphs, and to correct the false testimony and argument that flowed from the suppression of that evidence.

180. The suppressed evidence was material, likely to influence a jury's decision,

and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Johnson's trial would have been different.

181.   These actions deprived Johnson of his right:

(a)   Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

(b)   Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)   To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

182.   The foregoing violations of Johnson's federal constitutional rights by the Individual Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Johnson's criminal prosecution, loss of liberty, detention without bail, wrongful conviction, subsequent imprisonment, and other injuries and damages.

183.   The foregoing violations of Johnson's rights amount to constitutional torts and were affected by actions taken under color of State law, and within or without the scope of their employment and authority.

184.     The Individual Defendants committed the foregoing violations of Johnson's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Johnson's constitutional rights or to the effect of such misconduct on those rights.

185.     As a direct and proximate result of these acts and omissions, Johnson suffered the damages set forth in ¶ 158, above.

186.     The CITY is liable for these wrongs by virtue of DA Brown's and the NYPD's policies, customs, and deliberate indifference to, and failure to supervise, discipline, and rectify their employees conduct regarding such matters, despite the likelihood that the failure to do so would result in the injuries pled here.

### FOURTH CAUSE OF ACTION
(42 U.S.C. § 1983 Claim for Violation of  Johnson's
Right Against Self-Incrimination and to a Fair Trial)

187.     Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

188.     Defendants Cardamone and Brooks, acting individually and in concert, coerced Johnson into making incriminating statements against himself, fabricated evidence, and concealed material exculpatory and impeachment evidence thereby depriving Johnson of his Fifth, Sixth, and Fourteenth Amendment rights to be free from self-incrimination and to be provided a fair trial.

189.     Specifically, Cardamone and Brooks deliberately and recklessly coerced inculpatory statements from Johnson through intimidation which were not the product of Johnson's free will and rational intellect.

190.     Cardamone and Brooks, themselves or through other acted in concert or in conspiracy with them, then represented to prosecutors in police reports, in the course of charging and indicting Johnson, and at trial, that Johnson statements were in fact freely and voluntarily given, and that Johnson had independent knowledge of the crime that actually had been provided to him by Cardamone and Brooks.  The false evidence which Defendants Cardamone and Brooks thereby fabricated was introduced against Johnson at trial and was a basis for the jury's verdict against him.

191.     Defendants Cardamone and Brooks did not disclose to prosecutors that they obtained Johnson's confession through mental coercion.

192.     Their acts were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers. They acted with the specific intent to deprive Johnson of his constitutional rights.

193.     As a direct and proximate result of these acts and omissions, Johnson suffered the damages set forth in ¶ 158, above.

**FIFTH CAUSE OF ACTION**
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the QDAO's
unconstitutional policies, customs, and practices, and failure to supervise,
discipline, and rectify amounting to deliberate indifference)

194.     Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

195.     During Johnson's criminal trial prosecutors suppressed a mountain of *Brady* material from Johnson and his defense attorney.

196.     The misconduct of the QDAO in Johnson's case was not the result of one bad actor but of office-wide policies and practices that encouraged *Brady* violations as a means of securing convictions.[5]

197.     These practices routinely deprived criminal defendants of their fair trial rights.

198.     These practices were employed in Johnson's case and cost him twenty-four years of his life.

199.     There are two unlawful practices of the QDAO office that significantly contributed to Johnson's conviction.

200.     **First,** the QDAO had no effective mechanism for prosecutors to obtain *Brady* information known to other QDAO prosecutors in their office.  This practice made it easy for prosecutors disinterested in satisfying their *Brady* obligations to have "plausible deniability" that they were not aware of exculpatory materials.

201.     Under governing Supreme Court precedent, a prosecutor "has a duty to learn of any favorable evidence known to others in the prosecutor's office, as well as others acting on the government's behalf, including the police." *Kyles* v. *Whitley*, 514 U.S. 419, 437 (1995).

202.     Yet, the QDAO had no effective mechanism for prosecutors to access information known to others in the prosecutor's office. As a result, an ADA attempting to locate materials related to a particular topic or investigation could not easily do so.

203.     QDAO provided no training to prosecutors on how to locate *Brady* material known to other prosecutors in the office.

---

[5]A "plaintiff is allowed to plead in the alternative."  *Breton v. City of New York*, 404 F.Supp.3d 799, 814 (S.D.N.Y. 2019) (Koeltl, J), citing Federal Rule of Civil Procedure 8(d).

204.    QDAO policies and procedures inhibited prosecutors from learning of "favorable evidence known to others in the prosecutor's office."

205.    This case presents a stark example of how this grossly deficient and constitutionally infirm method of information storage would lead to the violation of criminal defendants' Constitutional rights.

206.    Based on the information he developed while reinvestigating Johnson case, CIU Director Bryce Benjet stated that "significant" *Brady* material connecting Speedstick to the Murders was "not contained in the files of these defendants [Messrs. Bell, Bolt and Johnson]."

207.    As a result, ADAs Fidel, Dorfman, and Morse could falsely claim that the QDAO did not have exculpatory files documenting Speedstick's involvement in the crime at the time that they responded to Plaintiff's requests for *Brady* material.

208.    Because this *Brady* information known to other prosecutors was not properly stored and/or not sufficiently accessible, Mr. Benjet concluded that the trial prosecutors' denials of the existence of such *Brady* materials were made "in good faith."

209.    In short, the ADAs responding to Johnson's discovery requests did not have ready access to those files and there was no policy, practice, or training for how these attorneys would obtain and review other prosecutors' files.

210.    This policy failure does not excuse the prosecutors' misconduct. Johnson, as well as codefendants Bell and Bolt's counsels cited to specific newspaper reports indicating that Speedstick members were suspects and Mr. Dorfman, Mr. Fidel, and Mr. Morse should have sought out materials, wherever located relating to that subject matter.

211.    Moreover, Testagrossa was aware of Jamal Clark's involvement in the murder two years earlier and, given the notoriety of Johnson's alleged crime, it is inconceivable that he did not check his prior notes, or review any files related to Jamal Clark at all, before issuing false denials of the relationship between the cases in open court and calling Johnson's defense team "despicable" for attempting to tie the two cases together.

212.    This lack of any mechanism (or training) for prosecutors to access other prosecutors' files enabled an "ostrich" approach to *Brady* obligations, where prosecutors could claim not to have seen exculpatory materials. This is exactly such a case. It is not plausible that the revelation that Speedstick was involved in the Astoria Boulevard Murders in 1997 would have just been glossed over. This case was notorious. It involved the murder of a police officer, was the only death penalty case in the office, and defense counsel (and the press) specifically probed the relationship between Speedstick, the Astoria Boulevard Murders, and the Flushing attack.

213.    Nevertheless, because this information was not stored in the case files, the ADAs running discovery in Johnson's case could simply avoid this information.

214.    The QDAO's policy, practice, and procedure of failing to have an effective mechanism for prosecutors to access information known to others in the prosecutor's office made it foreseeable to Defendant City of New York that prosecutors would not locate *Brady* material and thus would withhold *Brady* material from criminal defendants.

215.    This unlawful policy, practice, or custom of Defendant City of New York was a substantial factor in bringing about the violations of Plaintiff's rights under the Constitution and

laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

216.    **Second**, the QDAO as delegee of the Defendant City of New York had a custom and practice not to internally investigate, reprimand, sanction or discipline prosecutors for misconduct, including frequent *Brady* violations.

217.    This custom and practice encouraged, condoned, and ratified the prosecutors' deliberate and reckless disregard of their constitutional and ethical duties.

218.    Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final authority and is the City's policymaker in the training, instructing, supervising and disciplining of attorneys.

219.    The District Attorney of Queens County, Richard Brown, personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to such conduct.

220.    In the years before and during Johnson's conviction, the Queens County District Attorney's office, under Mr. Brown and his predecessor, John Santucci, had an extensive history of prosecutorial misconduct that caused constitutional violations, including, *inter alia*, *Brady* violations and knowing reliance on false testimony and argument and the failure to correct the same.

221.    The leadership of the QDAO knew that even a single instance of prosecutorial misconduct, if it led to no discipline, could poison the atmosphere of the entire office, as Acting District Attorney John Ryan acknowledged during a sworn deposition in another prosecutorial misconduct matter. Mr. Ryan also acknowledged the dire consequences inflicted on those who

were wrongfully convicted and agreed that "such dire consequences to others justify dire consequences to prosecutors who act unethically."[6]

222.    In early 1996, the executive leadership of the QDAO compiled a Prosecutorial Misconduct Survey (the "Survey").

223.    As the City confirmed in a Fed. R. Civ. P. 30(b)(6) deposition on December 1, 2020 in another matter, the Survey found that, in at least *39* cases, either an appellate court held that the QDAO committed misconduct (22 cases), or the QDAO admitted misconduct absent such a finding (17 cases).

224.    The QDAO's prosecutorial misconduct in the Survey included all of the above types of prosecutorial misconduct resulting in constitutional violations, including *Brady* and related discovery violations, summation misconduct, improper reliance on false evidence, and prejudicial degradation of criminal defendants.

225.    The instances of misconduct covered by the Survey constituted just a fraction of the total instances of misconduct the QDAO had committed between 1988 and 1995 and also did not include numerous additional incidences between 1985 and 1988, when Richard Brown was an appellate division justice and became aware of the pervasiveness of prosecutorial misconduct in the QDAO.

---

[6] *Accord* Amended Complaint in *Rhian Taylor v. City of New York*, 18 CV 5500 (KAM) (ST) (E.D.N.Y.) (Doc # 57) at ¶¶ 176-377, Amended Complaint in *Julio Negron v. City of New York,* 18 CV 6645 (DG) (RLM) (E.D.N.Y.) (Doc.# 92) at ¶¶ 208-306, Amended Complaint in *Kareem Bellamy v. City of New York*, 12 CV 1025 (AMD) (PK) (E.D.N.Y.) (Doc. #304) at ¶¶ 351-370, 390-423, Complaint in *Robert Majors v. City of New York*, 21 CV 5078 (AMD) (TAM) (E.D.N.Y.) (Doc # 1) at ¶¶ 43-244, and *Bell v. City of New York*, 22 CV (DG) (PK) (E.D.N.Y.) (Doc. # 1) at ¶¶ 313-412, detailing substantial evidence of the Queens DA's indifference and unlawful policies, which we incorporate into this Complaint by reference.

226.     All, or substantially all, of the QDAO prosecutorial misconduct cited in the

Survey occurred in the few years preceding Johnson's arrest, trial, and conviction.

227.     By way of example, the Survey cited the following cases, which represent a small

sample of the misconduct found in the Survey:

a.     *People v. Figueroa*, 181 A.D.2d 690 (2d Dep't 1992), ordering a new trial where the QDAO prosecutor's summation "went well beyond the bounds of fair advocacy," including suggesting that defendant's alibi was concocted after the witness met with defense counsel.

b.     *People v. Steadman/Blair,* 82 N.Y.2d 1 (1993), reversing a defendant's manslaughter conviction where the QDAO made a "determined effort" to avoid its obligations to disclose exculpatory evidence and to correct false testimony, by employing a "scheme" under which a QDAO supervisor would make a cooperation agreement with a witness's attorney, but not reveal the agreement to the prosecutors handling the defendant's case at trial, and not correct the witness's false testimony denying such an agreement.

c.     *People v. Fearnot*, 200 A.D.2d 583 (2d Dep't 1994), reversing a conviction where the QDAO withheld potential impeachment material, suggested without evidence that the defendant was a prostitute, and tried to inflame the jury by citing the AIDS epidemic, comments that "went beyond the permissible bounds of broad rhetorical comment and should not be repeated at a new trial."

d.     *People v. Montesa*, 211 A.D.2d 648 (2d Dep't 1995), reversing a conviction in part because the QDAO prosecutor elicited hearsay testimony from a witness and committed summation misconduct.

e.     *People v. Giersz*, 212 A.D.2d 805 (2d Dep't 1995), reversing a conviction where a QDAO prosecutor's summation "exceeded the broad bounds of rhetorical comment permissible in closing arguments."

f.     *People v. Scott*, 217 A.D.2d 564 (2d Dep't 1995), ordering a new trial where the QDAO's misconduct was "so flagrant and so pervasive that it was impossible for the defendant to receive a fair trial," including repeatedly referring to defendant as a convicted felon to convict him based on criminal propensity, and attempting to shift the burden of proof.

g.     *People v. Moss*, 215 A.D.2d 594 (2d Dep't 1995), reversing a conviction in part based on the QDAO prosecutor's disregard of the court's ruling limiting unfairly prejudicial evidence, cross–examination questions comparing defendant to Hannibal Lecter in Silence of the Lambs, and waving of a knife in front of the jury during summation.

h.     *People v. Leuthner*, 216 A.D.2d 327 (2d Dep't 1995), reversing a conviction due to serial misconduct by the QDAO prosecutor.

i.     *People v. James*, 218 A.D.2d 709 (2d Dep't 1995), noting "unacceptable practices engaged in by the [QDAO] prosecutor."

j.     *People v. Elder*, 207 A.D.2d 498 (2d Dep't 1994), reversing a conviction in part based on QDAO summation misconduct and reliance on unduly prejudicial evidence.

228.   Despite the serial misconduct that the Survey revealed, the City has admitted that the QDAO:

a.     Failed to change any QDAO policy;

b.     Failed to change any QDAO practice;

c.     Failed to change any QDAO procedure;

d.     Failed to discipline any QDAO prosecutor;

e.     Failed to change its disciplinary process for QDAO prosecutors (in fact, there was no process);

f.     Failed to identify which prosecutors committed the misconduct in the Survey;

g.     Failed to incorporate prosecutorial misconduct, including but not limited to court findings of prosecutorial misconduct, into employment evaluations of QDAO prosecutors;

h.     Failed to make any changes to the way prosecutors were evaluated;

i.     Failed to make any changes to the way prosecutors were supervised;

j.       Failed to create additional oversight by upper-level executives in the office;

k.       Failed to change any hiring practices for QDAO prosecutors;

l.       Failed even to inform trial QDAO prosecutors about the results of the Survey;

m.      Failed to inform appellate QDAO prosecutors about the results of the Survey;

n.       Failed to have any office-wide meeting to discuss the Survey or response to the Survey;

o.       Failed to track QDAO prosecutorial misconduct post-Survey;

p.       Failed to analyze QDAO prosecutorial misconduct, by type, by prosecutor, or by any other method; and

q.       Failed to do any follow-up prosecutorial misconduct survey.

229.     For his part, District Attorney Brown took no action at all in response to the Survey.

230.     Chief Assistant District Attorney Barry Schwartz was Brown's number two in the QDAO, and was delegated responsibility, inter alia, for discipline, promotions, and other supervision and personnel matters.

231.     Schwartz has no memory of the Survey or of almost any case cited in the Survey.

232.     Schwartz has stated in sworn deposition testimony that he has no memory of the QDAO "taking any kind of action in response" to the Survey.

233.     The QDAO's leadership in 1996 included Brown, Schwartz, and Chief of Appeals Steven Chananie. John Ryan replaced Schwartz as Chief Assistant in 1997 and remained in that role through Bell's conviction in 2002.

234.    All of them failed to take any of the above steps in response to the Survey.

235.    Nothing in the Survey surprised or could have surprised the QDAO's leadership.

236.    From the beginning of his tenure in 1991, Brown routinely read appellate decisions in QDAO cases. Barry Schwartz also routinely read those cases, as did Chananie. Schwartz also read QDAO reversal memos that summarized the disposition and reasoning of those cases. Those cases formed the basis for the results of the Survey.

237.    Throughout his tenure, from 1991 through the Bell trial and after, District Attorney Brown knew about prosecutorial misconduct by QDAO prosecutors.

238.    Brown and Schwartz purportedly "expressed concern" to each other "about reversals that characterized the trial assistant engaging in what the courts like to call 'prosecutorial misconduct.'"

239.    Yet neither took any systemic action to address, prevent, or punish prosecutorial misconduct in the QDAO.

240.    As damning as the Survey was, it contained a woefully incomplete summary of QDAO prosecutorial misconduct in the early 1990s.

241.    A number of prosecutors apparently failed to respond to the Survey, and the Survey missed recent misconduct of a number of prosecutors who had recently left the QDAO.

242.    As a result, at least *19* decisions (almost all appellate cases) *not* reflected in the survey found additional prosecutorial misconduct by the QDAO between 1991 and 1995 ("Additional Misconduct").

243.    The QDAO, including Brown and Schwartz, read and knew about these decisions, all of which were filed and available to the general public.

244.    The Additional Misconduct cited in these decisions was wide ranging, including *Brady* and *Rosario* violations, improper cross-examination, violation of court orders, summation misconduct, improperly eliciting evidence at trial, and improperly coaching a People's witness at trial.

245.    Decisions reflecting Additional Misconduct include, but are not limited to:

      a.    *People v. Stevens*, 174 A.D.2d 640 (2d Dep't 1991), reversing a conviction in part based on the QDAO prosecutor's statement in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that sodomy had occurred.

      b.    *People v. Gunther*, 175 A.D.2d 262 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor improperly attempted to show defendant's propensity to commit the charged crime of dealing cocaine by extensively cross-examining him on past convictions for dealing marijuana, in "a deliberate and calculated strategy to convict on the basis of improper and prejudicial hyperbole."

      c.    *People v. Gaskins*, 171 A.D.2d 272 (2d Dep't 1991), reversing a conviction where the QDAO prosecutor failed to disclose the videotape of an interview of the alleged child victim.

      d.    *People v. Parker*, 178 A.D.2d 665 (2d Dep't 1991), ordering a new trial in part based on the QDAO prosecutor's summation misconduct.

      e.    *People v. Curry*, 153 Misc.2d 61 (Sup. Ct. Queens Cty. Jan. 16, 1992), dismissing the indictment because the QDAO prosecutor failed to inform the grand jury that the complainant had recanted his identification and report of defendant's involvement in the crime.

      f.    *People v. Baba-Ali*, 179 A.D.2d 725 (2d Dep't 1992), reversing a rape conviction where, despite a court order, the QDAO prosecutor failed until the eve of trial to disclose medical records finding no signs of sexual abuse.

g.   *People v. Nieves*, 186 A.D.2d 276 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor engaged in improper cross-examination and summation.

h.   *People v. James*, 184 A.D.2d 582 (2d Dep't 1992), reversing a conviction where the QDAO prosecutor represented that the People would not introduce unfairly prejudicial evidence of defendant's prior possession of drugs, but then cross-examined a police officer extensively on that evidence and emphasized it in summation.

i.   *People v. Andre*, 185 A.D.2d 276 (2d Dep't 1992), reversing a conviction in part because of the QDAO prosecutor's summation misconduct.

j.   *People v. Odle*, 187 A.D.2d 536 (2d Dep't 1992), ordering a new trial where the QDAO prosecutor repeatedly and improperly elicited evidence of uncharged crimes to show criminal propensity and bad character, and committed summation misconduct.

k.   *People v. Banch*, 80 N.Y.2d 610 (1992), reversing a conviction where the QDAO prosecutor failed to disclose several pieces of potential impeachment material, and noting "the People's seeming lack of care in discharging their discovery obligation."

l.   *People v. Jenkins*, Ind. No. 2213/1992, declaring a mistrial "based on [QDAO] ADA Landa's 'prosecutorial misconduct' in 'hold[ing] back exculpatory information as long as possible' from defense counsel."

m.   *People v. Robinson*, 190 A.D.2d 697 (2d Dep't 1993), setting aside the verdict because the QDAO "prosecutor's misconduct deprived [defendant] of a fair trial," including "prepp[ing]" an officer during a recess to "rehabilitate him on his cross-examination," and committing summation misconduct.

n.   *People v. Robinson*, 191 A.D.2d 595 (2d Dep't 1993), ordering a new trial where the QDAO prosecutor "engaged in a series of improper remarks and tactics," including eliciting testimony about defendant's post-arrest silence, committing summation misconduct, eliciting improper expert testimony, and "derisive[ly]" commenting on the presumption of innocence.

o.   *People v. Kirchner*, 200 A.D.2d 766 (2d Dep't 1994), reversing a conviction where the QDAO failed to disclose potential impeachment evidence.

      p.    *People v. Shim*, 218 A.D.2d 757 (2d Dep't 1995), faulting the QDAO for failing to disclose potential impeachment evidence.

246.    The QDAO's failure to include any of the Additional Misconduct in the Survey is further evidence of deliberate indifference to prosecutorial misconduct in the office.

247.    In response to the Additional Misconduct, the QDAO:

      a.    Failed to change any QDAO policy;

      b.    Failed to change any QDAO practice;

      c.    Failed to change any QDAO procedure;

      d.    Failed to discipline any QDAO prosecutor; and

      e.    Failed to implement any new training.

248.    After yet another reversal due to a finding of prosecutorial misconduct District Attorney Brown wrote a note to his Chief Assistant, Jack Ryan, stating: "Jack – Let's discuss how to handle – I think we've been getting away with this kind of stuff for a long time."

249.    Notwithstanding rampant, wide-ranging prosecutorial misconduct in the QDAO, from at least June 1991 through January 1997 (Barry Schwartz's tenure as Chief Assistant), and continuing the following five years through January 2002 (under his successor, John Ryan), and DA Brown's acknowledgement that the office had been "getting away with this kind of stuff for a long time," the QDAO still:

      a.    Failed to discipline a single QDAO prosecutor for prosecutorial misconduct;

      b.    Failed to create a handbook or manual setting forth rules and procedures for prosecutors, including how to comply with their constitutional obligations;

c.     Per Schwartz' sworn testimony, had "no procedure in place" for "investigating prosecutorial misconduct of any type";

d.     Failed to note prosecutorial misconduct in an employment evaluation;

e.     Failed to have any practice or procedure to note prosecutorial misconduct in a personnel file;

f.     Had no policy, practice, or procedure to use reversal memos as part of employment evaluations;

g.     Failed to create any practice, policy or procedure to ensure that supervisors were aware of findings of prosecutorial impropriety;

h.     Failed to create any practice, policy or procedure to make Schwartz, Brown, or Ryan aware of misconduct by prosecutors before promoting them or increasing their compensation;

i.     Failed to include reversal memos, appellate decisions, or any document that might reflect prosecutorial misconduct in the packets compiled before Schwartz or Ryan recommended a promotion;

j.     Failed to keep records of findings of misconduct by individual prosecutor, by bureau, or by the Office as a whole;

k.     Failed to conduct any review of QDAO prosecutorial misconduct before June 1999; and

l.     Failed to do any trend analysis of prosecutorial misconduct over time.

250.    In addition to the approximately 58 cases of prosecutorial misconduct set forth supra, in opinions dated 1996, 1997, and after, courts repeatedly assailed the QDAO for yet more prosecutorial misconduct that occurred before Johnson's conviction, yet there was no adverse consequence to the prosecutors who were responsible and no change in office policy, practice or procedure to prevent still more such occurrences in the future.

251.    This misconduct included *Rosario* violations, *Brady* violations, suborning false testimony, and improper opening statements.

252.    Instead of disciplining such prosecutors, the District Attorney's policy, custom or practice was to give them raises, promotions, positive evaluations, and commendations, based in part on their record of winning at trial and their productivity in trying a lot of cases and extracting guilty pleas even in weak cases.

253.    The Office used evaluation forms, approved by the District Attorney or his Chief Assistant, with which bureau chiefs and other supervisors rated prosecutors in numerous categories of performance, but which nowhere asked for comment on their respect for or compliance with the due process or fair trial rights of criminal defendants.

254.    Every one of these evaluation forms were reviewed by John Ryan, the chief assistant to District Attorney Brown, and usually by Division chiefs, for purposes of determining raises, bonuses, and promotions.

255.    The district attorney delegated to Ryan and division chiefs the task of reviewing evaluations and recommending raises, bonuses, and promotions and almost always approved their recommendations.

256.    The evaluations were shown to the prosecutors who were evaluated in part for the purpose of communicating to them how successful they were being in implementing the goals of the Office and the types of behavior the Office approved of and wished to encourage.

257.    The completed evaluation forms would not reference court findings of misconduct or complaints by criminal defendants or their attorneys, no matter how egregious the misconduct.

258.    Thus, the message to the prosecutors was that the Office only cared about how aggressive and successful they were in processing and winning cases, not whether, in doing so, they violated the constitutional rights of the individuals they were prosecuting.

259.    The Office kept no records of negative court decisions or of complaints against individual prosecutors so that it could identify prosecutors who repeatedly were the subject of such decisions or complaints and who required greater training, supervision or discipline.

260.    Thus, when a court found that a prosecutor had committed misconduct, it had no data base or records from which to determine whether the same prosecutor had a history of engaging in similar or other misconduct.

261.    The Office kept no record of, and did not investigate, the failure of bureau chiefs and other supervisors to properly supervise staff attorneys to ensure that they complied with the due process and fair trial rights of criminal defendants.

262.    Although supervisors were supposed to monitor members of their bureau closely enough to ensure that constitutional violations did not occur, executives in the office would not follow up with supervisors to find out why Brady violations, summation, or other misconduct found by a court had been allowed or able to occur.

263.    Prosecutors were incentivized to violate the constitutional rights of criminal defendants, since they knew they were likely to be rewarded for winning but would suffer no negative consequence in the unlikely event their misconduct was exposed.

264.    Some examples illustrate how the QDAO created an office culture where prosecutorial misconduct was ignored, condoned, and rewarded.

**_Prosecutor A_**[7]

265.     In 1990, QDAO prosecutor A. prosecuted Robin Tellier. A. (i) failed to disclose _Rosario_ material; (ii) failed to disclose Giglio material; (iii) misrepresented to defense counsel that all _Brady_ and _Rosario_ material had been disclosed; (iv) misrepresented to the court whether federal prosecutors who had debriefed a People's witness were observing the trial; and (v) allowed a People's witness to claim a loss of memory concerning prior crimes, when information concerning those crimes was contained in the debriefing notes A. had failed to disclose.

266.     The Grievance Committee for the Ninth Judicial District later admonished A. for concealing the notes, for a "misrepresentation" to the court, and for engaging in "conduct involving dishonesty, fraud, deceit or misrepresentation."

267.     On October 1, 1991, the QDAO nevertheless gave A. an "Excellent" evaluation, noting: "This Assistant likes to win and fights towards that end."

268.     On May 1, 1992, the QDAO gave A. a "Very Good" evaluation, stating that A. "is a true warrior in that he never backs down or is intimidated."

269.     Neither evaluation mentioned the Tellier case, or A.'s unethical and illegal conduct in that case.

270.     On March 29, 1993, the Second Department found in People v. Kane that A. improperly in opening and closing arguments "impl[ied] the defendant's guilt of an unrelated burglary."

_____

[7]Prosecutors here are identified by the first initial of their last name.

271.    On September 1, 1993, the QDAO's Dan Saunders gave A. an "Outstanding" evaluation, noting that A. "acquitted himself well with every assignment he's undertaken" and that "[h]is judgment, temperament and advocacy skills are all outstanding." (Emphasis added.) Saunders was then the Chief of Homicide Trials at the QDAO.

272.    Saunders' 1993 evaluation failed to mention the Tellier or the Kane cases, or A.'s improper conduct in both.

273.    On February 2, 1995, the Queens Supreme Court granted a motion to vacate a conviction in People v. Moustakis, a decision later affirmed by the Second Department. A. prosecuted that case. The courts found that A. "fail[ed] to turn over 16 pages of notes of detailed admissions by a prosecution witness concerning his prior criminal history," details of which the witness "forgot" on the stand.

274.    On August 28, 1995, a few months after the first Moustakis decision, Schwartz announced to "the Entire Staff" A.'s promotion to Deputy Bureau Chief of the Supreme Court Long Island City Bureau. There, A. supervised 10-11 prosecutors.

275.    Per his regular practice at the QDAO, Schwartz promoted A. "in consultation with the district attorney," Mr. Brown.

276.    About two weeks later, on September 15, 1995, in a decision following a March 31, 1995 argument, the Second Department reversed the conviction in People v. Spinelli. A. prosecuted Spinelli. The Court found that A. improperly cross-examined an officer about the defendant's pretrial silence, engaged in summation misconduct, and held that "the prosecutor's conduct was fundamentally unfair."

277.     This decision also had no effect on A.'s promotion or, on information and belief,

A.'s career at the QDAO.

### *Prosecutor B*

278.     On December 13, 1993, Brown promoted QDAO prosecutor B. to Deputy Chief

of the Supreme Court Kew Gardens Bureau.

279.     On August 22, 1994, the Second Department reversed the conviction in *People v.*

*Elder*. B. prosecuted Elder. The Court found that B. engaged in "flagrant" "instances of

prosecutorial misconduct," in particular, summation misconduct, which "substantially prejudiced

defendant's case."

280.     Notwithstanding B.'s flagrant misconduct, B. did not receive any discipline, any

adverse consequence, or any new training.

281.     To the contrary, on April 27, 1995, Schwartz announced to "the Entire Staff" B.'s

promotion to Chief of the Intake Bureau.

282.     There, B. supervised intake for the entire QDAO.

### *Prosecutor D*

283.     On September 26 1994, the Second Department held in People v. Fanfan that the

QDAO "exceeded the bounds of a proper summation." D. prosecuted Fanfan.

284.     On May 15, 1995, the Second Department reversed the conviction in *People v.*

*Moss*.  D. prosecuted Moss. The Court founds that D. (i) compared the defendant to Hannibal

Lecter in the film Silence of the Lambs during cross-examination of the defendant; (ii) asked the

jury in summation to "place themselves in the position of victims being threatened by the

defendant"; (iii) disregarded the Court's Sandoval ruling; and (iv) waved a knife during summation.

285.    Surely a prosecutor like this would be fired, or at least disciplined, in any district attorney's office that cared about prosecutorial misconduct.

286.    Not the QDAO. On August 25, 1996, Schwartz announced to "the Entire Staff" D.'s promotion to Supervisor of the Training Bureau.

287.    There, fresh off comparing a defendant to Hannibal Lecter and waving a knife in front of the jury, D. taught prosecutors at the QDAO how to prepare and try cases. D. himself received no discipline or further training as a result of Fanfan or Moss.

### *Prosecutor K*

288.    On June 10, 1991, the Second Department reversed the conviction in People v. Stevens. K. prosecuted Stevens. As noted supra, the Court found that K. improperly stated in summation that "if this defendant wasn't charged with sodomy . . . he should have been," in a case where the defendant had not been indicted for sodomy and the complainant had not testified that an act of sodomy had occurred.

289.    In July 1991, Chief of Training Andrew Zwerling and Schwartz made K. a co-supervisor of the new QDAO Training Bureau. There, she trained prosecutors in all aspects of trial practice.

290.    On August 31, 1992, the Second Department reversed the conviction in *People v. Clausell*. K. prosecuted Clausell. The Court found that K. (i) failed to produce Brady material;

(ii) before opening statements, misrepresented to the trial court and to defense counsel that the Brady material did not exist; (iii) after an officer's testimony, again misrepresented to the trial court that the *Brady* material did not exist; and (iv) again failed to produce the *Brady* material. The defense then subpoenaed the material from the police department and received it, nine days after the conviction.

291.    After K.'s serial misconduct in Clausell, and notwithstanding that K. was a supervisor in the Training Bureau, the QDAO did not discipline her, give her any additional training, place a note in her evaluation or personnel file, or apparently take any other action. To the contrary, the QDAO gave K. twelve salary increases, three bonuses, and in 1997 promoted her, again, to become a Bureau Chief.

### ***Prosecutor L***

292.    On February 29, 1988, the Second Department reversed the conviction in *People v. Romain*. L. prosecuted Romain. The Court found that L. engaged in "gross distortion" in summation, "the magnitude of which was highly prejudicial."

293.    In May 1994, in the case of People v. Moore, L. questioned several witnesses about prohibited evidence (pending and other prior crimes), then compounded the misconduct by summing up on the prohibited evidence.

294.    On May 15, 1996, a QDAO executive (John Ryan) wrote Chief of Appeals Steven Chananie, Schwartz, and Andrew Zwerling a memo that L. "did engage in misconduct," which "we did not defend in our [appellate] brief."

295.    Ryan also wrote that the Second Department "once again, expressed their own concerns about the issue" of the QDAO's "prosecutorial misconduct." (Emphasis added.)

296.    The memo also noted Brown's "continuing concern about prosecutorial misconduct" in the QDAO.

297.    Nevertheless, after this memo, the QDAO gave L. five salary increases, one bonus, and a promotion to Intake Supervisor.

298.    QDAO prosecutors A., B., D., K., and L. are merely a few examples of QDAO prosecutors who violated the Constitution in the years leading to Johnson's conviction and immediately following it, faced no adverse action, received no further training or supervision, and continued to thrive and progress in the office.

299.    While additional training and discipline for misconduct was virtually non-existent, ADA Testagrossa himself has testified at a deposition in another matter that prosecutors in the QDAO's office at the time kept close tally of their trial win-loss records. He also stated he perceived that their victory percentage affected their promotions and compensation.
In sum, policymakers at the QDAO's office created a culture where winning mattered more than following the Constitution. They acted with deliberate indifference to constitutional violations generally, based on policy and practice, including those that injured Plaintiff, and failed to take any steps to protect against constitutional harms certain to occur without policies, practices, or procedures in place to prevent, address, or punish prosecutorial misconduct.[8]

300.    To the contrary, the deliberate indifference and policies and practices of QDAO policymakers, including the District Attorney and his designees, created a culture of

_____

[8]*Accord* Joel B. Rudin, *The Supreme Court Assumes Errant Prosecutors Will Be Disciplined by Their Offices or the Bar: Three Case Studies That Prove That Assumption Wrong*, 80 Fordham L. Rev. 537, 559-566 (2011).

prosecutorial misconduct that they knew was highly likely to cause further violations and which, in fact, did so in numerous cases, including Plaintiff's case.

301. These policies and practices which condoned and encouraged the suppression of *Brady* material in the name of securing a conviction, (and, at a minimum ensured there would be no repercussion for prosecutors who did so) were a proximate cause of the constitutional violations of ADAs Lasak, Testagrossa, Leventhal, Cantoni, Dorfman, Morse, and Fidel set forth supra, which caused the conviction of Plaintiff.

302. These prosecutors knew that the QDAO valued winning over following the Constitution (and all the more so when a police officer was killed and the Mayor was demanding swift punishment), and they were right, which caused the conviction of Plaintiff.

303. The QDAO's policy, practice, and procedure of allowing prosecutors to commit prosecutorial misconduct in dozens of cases, without consequence, made it foreseeable to Defendant City of New York that prosecutors would commit misconduct in Johnson's case, including withholding *Brady* material. These unlawful policies, practices, and customs of Defendant City were a substantial factor in causing the violations of Plaintiff's rights under the Constitution and laws of the United States and in causing his wrongful conviction, imprisonment and related damages.

304. Under the principles of municipal liability for federal civil rights violations, the District Attorney of Queens County (or his authorized delegates) has final managerial responsibility for instructing supervising and disciplining attorneys and other employees in his office regarding their conduct in the prosecution of criminal matters, including, but not limited to, their obligations not to coerce witnesses or manufacture false or unreliable "evidence," not to

abuse judicial process, to make timely disclosure of exculpatory evidence or *Brady* material to the defense, including post-trial, and to refrain from offering, and to correct, false, misleading, or prejudicial evidence, testimony, and argument during pretrial, trial, and post-trial proceedings.

305.    DA Brown who was the highest-ranking New York City official with responsibility for setting and enforcing policy with respect to managing his office's personnel and the functions of the office, had final policymaking authority in all such areas.

306.    DA Brown personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision and discipline, with respect to his office's performance of its duties.

307.    DA Brown at all relevant times was an elected officer of Queens County, one of the constituent counties of the CITY, and the office was and is funded out of the CITY's budget

308.     Furthermore, DA Brown, as the District Attorney, was and is designated a "local officer," rather than a "state officer," under the New York Public Officers Law (§ 2) and federal Monell jurisprudence, Bellamy v. City of New York, 914 F.3d 727 (2d Cir. 2019); and New York has provided by statute (N.Y. County Law§§ 53, 941) that the CITY's constituent counties (including Queens County), and hence the CITY itself, shall have liability for torts committed by County officers and employees, such as the District Attorney and his assistants.

309.    DA Brown personally and/or through his authorized delegates, at all relevant times had final authority, and constituted a City policymaker for whom the City is liable, with respect to the above-mentioned areas.

310.     During all times material to this Complaint, the CITY, through its policymakers, owed a duty to the public at large and to Johnson, which such policymakers knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs and practices sufficient to prevent, deter, and avoid conduct by their subordinates violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

311.     ADA Leventhal, who prosecuted Johnson and his codefendants,  acted in accordance with these QDAO practices, policies, and customs when he repeatedly, without fear of reprisal, withheld valuable *Brady* material (and, at times, failed to search and locate exculpatory materials) clearly indicating that someone else had, in fact, committed the murder for which they were seeking the death penalty against Bell (among other valuable exculpatory evidence), made multiple false statements in open court that no *Brady* material existed,

312.     By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of Johnson's constitutional rights and his resultant injuries (¶ 158, above).

313.     The foregoing violations of Plaintiff's constitutional rights, and his resultant injuries, were directly, foreseeably, proximately, and substantially caused by conduct, chargeable to Defendant THE CITY OF NEW YORK, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, subject to prosecution by the Queens County District Attorney's Office, namely:

a.     The institution and implementation by the District Attorney of plainly inadequate or unlawful policies, procedures, regulations, practices and/or customs concerning:

i.    The duty not to use false, misleading or unreliable evidence, testimony, statements or argument during criminal proceedings;

ii.    The obligation to correct false, inaccurate, incomplete or misleading evidence, testimony, statements and argument, whenever such misconduct is discovered to have occurred;

iii.    The obligation not to make false, prejudicial, or inflammatory summation arguments;

iv.    The continuing obligation to timely and fully disclose material, in the possession, custody or control of the District Attorney's Office or of the police, that is favorable to the defense within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 450 U.S. 150 (1972), and their progeny; and

b.    The District Attorney's deliberate indifference to the need, and his failure, to adequately investigate, supervise, discipline, and/or rectify his employees' conduct with respect to such matters.

314.    The aforesaid deliberate or *de facto* policies, procedures, regulations, practices and/or customs, including the failure to properly investigate, supervise, discipline, and/or rectify employees' conduct with regard thereto, were implemented or tolerated by policymaking officials for Defendant City, including, but not limited to, the District Attorney of Queens County and his delegates, who knew:

a.    To a moral certainty that such policies, procedures, regulations, practices and/or  customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

b.    That such issues present employees with difficult choices of the sort that instruction, training, supervision, and discipline will make less difficult or will incentivize correct choices;

c.    That the wrong choice by municipal employees concerning such issues will frequently cause the deprivation of the constitutional rights of an accused and cause him constitutional injury; and

d.    That employees of the QDAO had a history of making wrong choices in such matters.

315.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph, based upon:

      a.    Numerous credible allegations, many substantiated by judicial decisions as demonstrated above, that Queens County ADAs had:

            i.    Participated in the manufacturing of false testimony or evidence, including identification evidence;

            ii.    Presented or failed to correct false or misleading testimony and argument;

            iii.    Failed to disclose at all, or on a timely basis, information favorable to the defense that was required to be disclosed by the Constitutions and the laws of the United States and of the State of New York;

            iv.    Made arguments at trial that were so false, misleading, inflammatory, or otherwise improper that they deprived the defendant of due process and a fair trial; and

      b.    The inherent obviousness of the need to train, supervise and discipline ADAs in their aforementioned constitutional obligations to counteract the pressure that the Queens County District Attorney applied to prosecutors to obtain convictions.

316.     By virtue of the foregoing, the CITY is liable for having substantially caused the foregoing violations of Johnson's constitutional rights and his resultant injuries (¶ 158, above).

**SIXTH CAUSE OF ACTION**
(*Monell*/42 U.S.C. § 1983: Claim Against the CITY based on the conduct of the NYPD)

317.     Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

318.     The foregoing violations of Johnson's federal constitutional rights and injuries were further directly, foreseeably, proximately, and substantially caused by conduct, chargeable

to the CITY amounting to deliberate indifference to the constitutional rights of persons, including Johnson, who are investigated, arrested, or prosecuted for alleged criminal activities.

319.    Prior to Johnson's arrest, policymaking officials at the NYPD, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting and convicting innocent people, and to the rights of all criminal suspects and defendants to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

> (a)    The use of excessive promises of rewards and unduly coercive interrogation techniques with vulnerable potential witnesses, including drug users and addicts, and/or individuals fearing prosecution and imprisonment for their own criminal behavior;
>
> (b)    The determination of probable cause to make an arrest; and
>
> (c)    The continuing duty of police investigators to preserve and to make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information (*Brady* material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with his constitutional obligation to disclose such information to the defense under *Brady*.

320.    With respect to "a" and "c" in the preceding paragraph, prior to Johnson's 1996 arrest and later prosecution, the NYPD provided no training at all.[9]

---

[9]Deposition testimony from present and former police detectives, including supervisors, during several civil rights lawsuits, including *Zahrey v. City of New York, et al.*, 98 Civ. 4546 (DLP) (S.D.N.Y.), establishes, prior to and during the time period of Johnson's 1996 arrest, the NYPD provided no training concerning appropriate interrogation of accomplice or informant witnesses and Brady compliance.  Most such witnesses had no idea what "*Brady*" was and no clue about their obligation to comply with it.

321.     The aforesaid deliberate or de facto policies, procedures, regulations, practices and/or customs (including the failure to properly instruct, train, supervise and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the CITY, including but not limited to, the New York City Police Commissioner, who knew (or should have known):

(a)     To a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     That such issues either present police employees with difficult choices of the sort that instruction, training and/or supervision will make less difficult or that the need for further instruction, training, supervision and/or discipline was demonstrated by a history of police employees mishandling such situations as well as the incentives that police employees have to make the wrong choice; and

(c)     That the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

322.     The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Johnson's constitutional rights beginning with his false arrest and the initiation of a criminal prosecution against him without probable cause and continuing throughout his criminal proceedings, trial and incarceration.

323.     The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, and the need to investigate and supervise officers by, among other circumstances:

(a)    Credible allegations, many substantiated by judicial decisions, finding that NYPD officers had wrongfully withheld material evidence or knowingly given false or misleading testimony;

(b)    Fifty civil lawsuits, from 1992 to 2000, some of which resulted in substantial civil settlements, credibly alleging that police had falsified, exaggerated, or withheld material evidence, or conducted searches or arrests without probable cause;

(c)    Numerous decisions of the United States Supreme Court, the United States Court of Appeals for the Second Circuit, the New York Court of Appeals, and the New York Appellate Division, discussing the difficult issues that regularly arise under *Brady* as well as the probable cause requirement of the Fourth Amendment;

(d)    Judicial decisions directly criticizing the NYPD for failing to train and supervise officers in their Brady obligations and for failing to adopt adequate *Brady* disclosure policies, *see Carter v. Harrison*, 612 F. Supp. 749 (E.D.N.Y. 1985) (McLaughlin, D.J., adopting the Report and Recommendation of then Magistrate Shira A. Scheindlin), and putting the NYPD on notice that the CITY could be held liable for its failure to adequately train police officers and investigators regarding their obligations to provide truthful testimony and to disclose evidence that favors criminal defendants under *Brady*, *see Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992), and *Carter v. Harrison*, above;

(e)    Formal reports of the New York City Comptroller's Office and the Bar Association of the City of New York criticizing the NYPD and the NYC Law Department for failing to follow up substantial civil settlements for police misconduct with disciplinary or other remedial action; and

(f)    The inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers and the powerful incentives they have to close cases and to obtain arrests and convictions.

324.   Evidence that the NYPD, in 1996-1999, had notice, and policies and customs of, deliberate indifference to police misconduct, including the coercion of false or misleading statements, fabrication of evidence, and withholding information favorable to the defense, is evidenced by The Report of the Commission to Investigate Allegations of Police Corruption and

the Anti-Corruption Procedures of the Police Department ("Mollen Commission"),  dated July 7,

1994.

325.   The Mollen Commission report establishes that:

In the face of th[e] problem of corruption, the Department allowed its systems for
fighting corruption virtually to collapse. It has become more concerned about the
bad publicity that corruption disclosures generate than devastating consequences
of corruption itself. As a result, its corruption controls minimized, ignored and at
times concealed corruption rather than root it out …. Thus, there is a strong
institutional incentive to allow corruption efforts to fray and lose priority – which
is exactly what this Commission uncovered. This reluctance manifested itself in
every component of the Department's corruption controls from command
accountability and supervision, to investigations, police culture, training, and
recruitment. For at least the past decade, the system designed to protect the
Department from corruption minimized the likelihood of uncovering it.

Mollen Commission Report, p. 2-3.

326.   Other circumstances and government reports put the CITY on notice as well

regarding the need to investigate, discipline, and supervise its police officers:

(a)   In 1990, the Office of Special Prosecutor, which investigated charges of police
corruption, was abolished.

(b)   The Mollen Commission concluded police perjury and falsification of official
records is probably the most common form of police corruption facing the
criminal justice system:

…Regardless of the motives behind police falsifications, what is
particularly troublesome about this practice is that it is widely tolerated by
corrupt and honest officers alike, as well as their supervisors. Corrupt and
honest officers told us that their supervisors knew or should have known
about falsified versions of searches and arrests and never questioned them,
…What breeds this tolerance is deep-rooted perception among many
officers of all ranks within the Department that nothing is really wrong
with compromising facts to fight crime in the real world.  Simply put,
despite the devastating consequences of police falsifications, there is a
persistent belief among many officers that it is necessary and justified,
even if unlawful. As one dedicated officer put it, police officers often view
falsification as, to use his words, "doing God's work" – doing whatever it

> takes to get a suspected criminal off the streets.  This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."

> Mollen Commission Report, p. 36, 40-41.

327.   Furthermore, since at least 1984, well before the police framed Johnson in 1996, the CITY and the NYPD were on notice of the inadequacy of its training, supervision, and discipline policies, and that police officers joining the force were disproportionately involved in the same type of misconduct and abuse as Johnson's case.  *See e.g.* Mayor's Advisory Committee on Police Management and Personnel Policy, Final Report, February 24, 1987.

328.   The City policymakers were on notice in 1992-1993 of the lack of supervision and discipline of NYPD officers by virtue of:

(a)   The City of New York Office of the Comptroller, in an unpublished report, found that the police often conduct inadequate investigations;

(b)   Prior to July 1993, the Civilian Complaint Review Board ("CCRB"), which is responsible for receiving and investigating complaints of police misconduct made by citizens  against members of the NYPD, operated as an agency of the NYPD rather than as an independent, unbiased entity;

(c)   During the 1980s, the early 1990s, and a few years before murder investigation in Johnson's case, the CCRB received numerous complaints of police misconduct, but failed to fully investigate many of them and substantiated the guilt of the accused police officer in a suspiciously minuscule number of cases;

(d)   On average, in 1990-1992, the CCRB conducted complete investigations of only 36 percent of the complaints received, closed 40 percent of the total cases without completing full investigations, and substantiated only 3.3 percent of the total complaints received;

(e)   The CCRB has also failed to recommend disciplinary action in the vast majority of its cases;

(f)     On average, in 1990-1992, the CCRB recommended disciplinary action in only 7.5 percent of its disposed of cases;

(g)     Moreover, most of the complaints that are substantiated by the CCRB did not result in any kind of meaningful discipline. For instance, as of November 14, 1991, of the 80 officers who faced departmental trials in 1991, 47 were cleared, and 34 were disciplined with penalties ranging from loss of vacation to a 90- day suspension;

(h)     Damages have been awarded to victims of police misconduct in 300-400 cases annually since 1988, as a result of out-of-court settlements or judgments in civil actions. Meanwhile, on average, only about 107   complaints were substantiated annually by the CCRB in 1988-1992;

(i)     The money paid out by the City in damages to alleged victims of police misconduct rose from approximately $7 million in 1988, to $13.5 million in 1992, to $24 million in 1994;

(j)     More than $82 million was paid in damages to victims of police misconduct in 1,352 cases between 1992 and 1995;

(k)     In the vast majority of police misconduct cases that result in verdicts or substantial settlements for victims, the CITY imposed no discipline, either before or after resolution in court, almost never reopened an investigation previously conducted after such resolution, and sometimes promoted the abusive officer to a position of greater authority despite the judicial resolution; and

(l)     Former New York City Police Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."[10]

329.     The NYPD's policy, custom and practice of approval and/or ratification of, toleration and/or acquiescence in, or deliberate indifference to violations of its constitutional obligations foreseeably encouraged such violations to continue and was a substantial cause of the violations of Johnson's constitutional rights beginning with his false arrest and the initiation of a

---

[10]*Accord* Amended Civil Complaint in *Negron v. City of New York*, 18 CV 6645 (DG) (RLM) (S.D.N.Y.) (Doc. # 1) at ¶¶ 213-373, incorporated here by reference (detailing numerous additional instances of police misconduct which provided the NYPD with notice of its officers misconduct, and establish the NYPD's policy of acquiescence and ratification).

criminal prosecution against him without probable cause, and continuing throughout his criminal trial, conviction, and incarceration.

330.    Under the principles of municipal liability for federal civil rights violations, the City's Police Commissioner (or his authorized delegates), had final responsibility for training, instructing, supervising, and disciplining police personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, the use of only truthful evidence, and the disclosure of *Brady* material.

331.    The Police Commissioner, personally and/or through his authorized delegates, at all relevant times had final authority and constitutes a City policymaker for whom the City is liable, with respect to compliance by NYPD employees with the above-mentioned constitutional requirements.

332.    During all times material to this Complaint, the Police Commissioner owed a duty to the public at large and to Johnson, which he knowingly and intentionally breached, or to which he was deliberately indifferent, to implement policies, procedures, customs, practices, training, supervision and discipline sufficient to prevent or deter conduct by his subordinates violating the aforementioned constitutional rights of criminal suspects.

333.    The aforesaid policies, procedures, regulations, practices and/or customs of the City and the NYPD were collectively and individually a substantial factor in bringing about the aforesaid violations of Johnson's rights under the Constitution and laws of the United States.

334.    By virtue of the foregoing, the City is liable for Johnson's damages (¶ 158).

## SEVENTH CAUSE OF ACTION
### (42 U.S.C. §1983 Civil Conspiracy; All Individual Defendants)

335.    Plaintiff realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

336.    Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, along with non-City employees such as Bigweh, Gouse, and others, all explicitly and/or implicitly corruptly agreed to commit with each other and/or other unnamed conspirators, the wrongs detailed above, and to ultimately have Johnson falsely arrested, prosecuted, convicted, and to cover-up each others' misconduct.

337.    Each defendant then committed overt acts, as detailed above to accomplish the goal of the conspiracy, including, but not limited to (a) framing and falsely arresting and prosecuting Johnson of the murder, and (b) covering-up those actions and the *Brady/Giglio* material that undermined the case against Johnson.

338.    By virtue of the foregoing, defendants conspired to deprive Johnson of his constitutional rights to:

> (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based upon false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity");

> (b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c) To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

339. Each of the above conspirators committed the foregoing violations of Johnson's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to them, or to the effect of such misconduct upon them.

340. By reason of the foregoing, those defendants are liable to Johnson pursuant to 42 U.S.C. § 1983, for compensatory and punitive damages detailed in ¶ 158, above.

341. The City is liable for these wrongs by virtue of the NYPD's deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here.

## EIGHTH CAUSE OF ACTION
(Malicious Prosecution Under New York Law; All Defendants)

342. Johnson realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

343. By virtue of the foregoing, Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, acting in concert with each other and with additional persons for whose acts they are liable, initiated, continued, and/or caused the initiation or continuation of, criminal proceedings against Johnson.

344. The criminal proceedings terminated in Johnson's favor.

345. There was no probable cause for the commencement or the continuation of the criminal proceedings.

346.    The Defendants acted with actual malice.

347.    Defendants the CITY is liable for these wrongs under the principle of respondeat superior, and for the damages set forth in ¶ 158, above.

### NINTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress Under New York Law;
All Individual Defendants)

348.    Johnson realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

349.    Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-6, engaged in a continuous pattern of extreme and outrageous conduct directed at Johnson from December 24, 1996, until his release from prison on March 2021.

350.    Those Individual Defendants engaged in that pattern of conduct with an intention to cause, or in reckless disregard of the substantial probability that it would cause, Johnson severe emotional distress.

351.    Specifically, those defendants, individually, acting in concert with, conspiring with, and/or aiding and abetting one another and other persons for whose acts they are liable, coerced witnesses into making false statements to be used against Johnson, including statements by Bigweh, Bell, and Ligon, coerced those individuals to adopt false statements Defendants manufactured, created false official records to be used against Johnson, initiated or caused the initiation and continuation of false and unfounded criminal charges against Johnson while lacking probable cause to do so, suppressed *Brady* and *Giglio* material, and lied to prosecutors, courts, and the jury at Johnson's trial.

352.     As a result, Johnson suffered severe emotional distress and damages (¶ 158, above) that was proximately caused by the Defendants' conduct.

## TENTH CAUSE OF ACTION
(Negligent Training and Supervision, and Discipline Under New York Law; The City)

353.     Johnson realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

354.     By virtue of the foregoing, the City is liable to Johnson because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately supervise, and discipline its agents, servants and/or employees employed by the QDAO and NYPD with regard to their aforementioned duties.  As such, the CITY is liable for Johnson's damages set forth in ¶ 158, above.

## ELEVENTH CAUSE OF ACTION
(New York State Constitutional Due Process Claim Against The CITY Pursuant To Respondent Superior; *Buari v. City of New York*, 2021 WL 1198371 (S.D.N.Y.  2021)

355.     Johnson realleges the allegations in the above paragraphs of this Complaint, and incorporates them here and in all following paragraphs.

356.     Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-4, by virtue of their acts and omissions detailed above, violated Johnson's rights under the Due Process and Equal Protection provisions of the New York State Constitution (a) to be free of unlawful arrest not based on probable cause, (b) to not have a government officer acting in an investigating capacity fabricate evidence against him, (c) to due process of law, (d) to a fair trial, (e) to not be convicted based on false or misleading evidence and argument, and suppression of *Brady* material, and (f) to not be incarcerated when actually innocent.

357.    As a direct and proximate result of these defendants' acts and omissions, Johnson was wrongfully arrested, prosecuted, convicted, and imprisoned for 24 years, and suffered other grievous and continuing injuries set forth in ¶ 158, above.

358.    The City is liable under respondeat superior for the acts and omissions of Cardamone, Brooks, Pia, Sica, Heider, Bovino, Bubelnik, Nevins, Falciano, and Does 1-4, within the scope of their employment, for Johnson's damages (¶ 158, above).

WHEREFORE, Johnson demands judgment against defendants as follows:

a.    For compensatory damages of not less than $60,000,000;

b.    For punitive damages against the individual defendants of $100,000,000;

c.    For reasonable attorneys' fees together with costs under 42 U.S.C. § 1988;

d.    For pre-judgment interest as allowed by law;

e.    For such other and further relief as this Court may deem just and proper.

DATED:    Yonkers, New York
          June 6, 2022

*Thomas Hoffman*

_____

THOMAS HOFFMAN, ESQ.
Law Offices of Thomas Hoffman, LLC
37 Elaine Terrace
Yonkers, New York 10701-5257
Office: (212) 581-1180
Cell: (917) 589-6156
Email: thoff93451@aol.com

*Attorney for Gary Johnson*